ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG 1 4 2008

CLERK. U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| JOHN D. NORSWORTHY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>I2 TECHNOLOGIES, INC., SANJIV SIDHU, JACKSON L. WILSON, JR., RICHARD L. CLEMMER, J. COLEY CLARK, STEPHEN BRADLEY, LLOYD G. WATERHOUSE, RICHARD HUNTER, DAVID L. POPE, MICHAEL SIMMONS, AMALGAMATED GADGET, L.P., and JDA SOFTWARE GROUP INC.<br><br>Defendants. | CASE NO. _____<br><br>**3-08 CV 1424-G**<br><br>24347 |

### DEFENDANT'S NOTICE OF REMOVAL

Please take notice that Defendant JDA Software Group Inc. ("JDA") hereby removes this action from the 134th Judicial District Court of Dallas County, Texas to the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. §§ 1332 and 1441, because the action is subject to diversity jurisdiction. JDA respectfully states to this Court the following:

### I.     INTRODUCTION

On August 12, 2007, Plaintiff John D. Norsworthy ("Norsworthy") filed this action against JDA in the 134th Judicial District Court of Dallas County, Texas, Cause No. 08-09245. Northsworthy alleges causes of action against JDA and others for breach of fiduciary duty. Original Petition.  Northsworthy seeks to enjoin a merger between Defendant JDA and i2 Technologies, Inc. valued at $346 million dollars. Org. Pet. p. 28, 39.

This action is one in which this Court has original subject-matter jurisdiction under the provisions of 28 U.S.C. § 1332, and is one which may be removed to this Court by JDA pursuant to 28 U.S.C. § 1441(b), in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Copies of the original petition filed in the state court are attached hereto.

## II.    DIVERSITY OF CITIZENSHIP

There is diversity of citizenship in this action. *See* 28 U.S.C. § 1332.

Northsworthy does not allege his state of residence. Orig. Pet. p. 16. Upon information and belief, he is not a resident of the state of Texas, or else would have alleged his residence in the Original Petition as a citizen of Texas to defeat diversity jurisdiction.

JDA was at the time this suit was filed, and is presently, a corporation organized under Delaware law with its principal place of business in Arizona.

## III.    AMOUNT IN CONTROVERSY

The amount in controversy requirement of 28 U.S.C. § 1332(a) is satisfied. Northsworthy seeks to enjoin a merger between Defendant JDA and Defendant i2 Technologies valued at $346 Million Dollars. Orig. Pet. at 28, 39. Thus, the amount in controversy is in excess of $75,000, not including costs and interest.

## IV.    REMOVAL IS TIMELY

JDA has not yet been served with a copy of the Original Petition. Upon information and belief, none of the other Defendants have been served with the Original Petition. Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

## V.    PROPER COURT FOR REMOVAL

The United States District Court for the Northern District of Texas, Dallas Division, embraces Dallas County, the county in which the state court action is now pending. 28 U.S.C.

§ 124(d)(1). Thus, this case is properly removed to this Court pursuant to 28 U.S.C. § 1441(a).

## VI. CONCLUSION

Upon filing this Notice of Removal, written notice of the filing is being given by JDA to Northsworthy and counsel, and is being filed with the Clerk of the state court in which this cause was originally filed, as required by 28 U.S.C. § 1446(d).

WHEREFORE, JDA hereby removes the above-styled action pending against it in the 134th Judicial District Court of Dallas County, Texas, to this Honorable Court.

Respectfully submitted,

Dated: August 14, 2008

By: _J.A.L. with permission by David A._ _Alexander_
JENNIFER A. LLOYD (Bar No. TX-24013050)
**DLA PIPER US LLP**
1221 S. MoPac Expressway, Suite 400
Austin, TX 78746-7650
Tel: 512.457.7000
Fax: 512.457.7001

1717 Main Street, Suite 4600
Dallas, TX 75201-4629
Phone: 214.743.4500
Fax: 214.743.4545

ATTORNEYS FOR DEFENDANT
JDA Software Group Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served in compliance with Texas Rules of Civil Procedure 21 and 21a by _Cert Mail RRR_ on this 14th day of August, 2008 on the following counsel of record:

BARON & BUDD, P.C.
KELLY N. EDDELL
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92 101
Telephone: 619/231-1058
619/23 1-7423 (fax)

_J.A.L. with permission by_
Jennifer A. Lloyd          _David A. Alexander_

# EXHIBIT A
## ORIGINAL STATE COURT PETITION

Case No. 08-09245

ORIGINAL

JOHN D. NORSWORTHY, On Behalf of §
Himself and All Others Similarly Situated, §
§
§
Plaintiff §
§
vs. §
§
I2 TECHNOLOGIES, INC., SANJIV SIDHU, §
JACKSON L. WILSON, JR., RICHARD L. §
CLEMMER, J. COLEY CLARK, STEPHEN §
BRADLEY, LLOYD G. WATERHOUSE, §
RICHARD HUNTER, DAVID L. POPE, §
MICHAEL SIMMONS, AMALGAMATED §
GADGET, L.P. and JDA SOFTWARE §
GROUP INC., §
§
Defendants. §
§

IN THE DISTRICT COURT

DALLAS COUNTY, TEXAS

G-134th DISTRICT COURT

---

## ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY AND REQUESTS FOR PRODUCTION

COMES NOW, Plaintiff JOHN D. NORSWORTHY, On Behalf of Himself and All Others Similarly Situated, complaining of I2 TECHNOLOGIES, INC., SANJIV SIDHU, JACKSON L. WILSON, JR., RICHARD L. CLEMMER, J. COLEY CLARK, STEPHEN BRADLEY, LLOYD G. WATERHOUSE, RICHARD HUNTER, DAVID L. POPE, MICHAEL SIMMONS, AMALGAMATED GADGET, L.P. and JDA SOFTWARE GROUP INC., (herein after referred to as "Defendants") and would respectfully show unto this Honorable Court the following.

## DISCOVERY LEVEL

1.     Pursuant to Rule 190.1 of the Texas Rules of Civil Procedure, plaintiff would show that discovery is intended to be conducted under level 3 of this Rule due to the complexity of the case.

## SUMMARY OF THE ACTION

2.     This is a stockholder class action brought by plaintiff on behalf of the holders of i2 Technologies, Inc. ("i2" or the "Company") common stock against i2 and certain of the Company's officers and/or directors (the "Board"), arising out of their efforts to sell i2 to JDA Software Group Inc. ("JDA") via an unfair process and at an unfair price of only $14.86 per share of common stock (the "Proposed Acquisition"). The Board was and continues to be aided and abetted in their unlawful efforts to sell i2 by the Company, Amalgamated Gadget, L.P. ("Amalgamated") and JDA. In pursuing the unlawful Proposed Acquisition, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing.

3.     i2 is a provider of supply chain management solutions, consisting of various software and service offerings.

4.     i2 is substantially controlled by insiders Sanjiv Sidhu ("Sidhu"), the Chairman Emeritus of the Board, and Amalgamated. Collectively, Sidhu and Amalgamated control 38% of the Company's common shares, and 100% of the Company's Series B Preferred stock. Amalgamated controls four seats on the Board, currently staffed by defendants J. Coley Clark ("Clark"), Richard Hunter ("Hunter"), David L. Pope ("Pope") and Michael Simmons ("Simmons"). Sidhu and Amalgamated, and the rest of the Board and i2's officers, have agreed to vote all their common stock and preferred shares in favor of the Proposed Acquisition, making it a virtual *fait accompli.*

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 2

5.     Until April 30, 2007, i2's stock traded above $26 per share, substantially above the sale price defendants agreed to in the Proposed Acquisition. However, i2 stock – paralleling the overall market – temporarily declined to as low as $13.86 per share in September 2007.

6.     Thereafter, Amalgamated began agitating for a sale of the Company. Because of Amalgamated's presence on the Board, it was able to convince the rest of the Board to pursue a sale of the Company. Amalgamated pushed for a sale of the Company to serve its own interests, including monetization of its Series B Preferred Shares at a preferred exchange rate that ensures Amalgamated will receive a disproportionate amount of the merger consideration as compared to the Company's common stockholders. Likewise, Sidhu was incentivized to push for a sale of the Company so that he could monetize his illiquid control block holding in the Company after stepping down as the Company's Chairman of the Board. Furthermore, the directors on the Board not directly affiliated with Amalgamated were incentivized to agree to the Proposed Acquisition in part because, if consummated, the Proposed Acquisition will extinguish their liability in outstanding shareholder derivative lawsuits that name them as defendants.

7.     Defendants announced the Proposed Acquisition on August 11, 2008, just after releasing stellar financial results primarily driven by the monetization of but one of the Company's assets in its lucrative patent portfolio, via a settlement of litigation for $83.3 million. The Proposed Acquisition as currently constituted does not adequately value i2's extensive patent portfolio or its $8.1 billion worth of NOL tax credits, nor does it compensate shareholders for the nearly $20 million in annual synergies JDA expects to receive from the combined companies post-merger. To make matters worse, defendants are permitting JDA to finance the Proposed Acquisition in part with the Company's cash on hand.

8.    Defendants have also agreed to lock up the Proposed Acquisition through the use of onerous deal protection devices that preclude competing bidders from making a successful bid for the Company to compete with the unfair Proposed Acquisition. Specifically, as part of the Merger Agreement with JDA, defendants agreed to: (i) a "poison pill" lock-up that prevents any competing bidder from making a tender offer for the Company directly to its sharehholders; (ii) pay JDA a termination fee of $15 million in the unlikely event that a superior proposal for the Company is accepted by the conflicted Board; (iii) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (iv) a "matching rights" provision that allows JDA three days to match any superior proposal; (v) a provision that precludes the Board from waiving the terms of any existing standstill provision except under very limited circumstances; and (vi) voting agreements that amount to irrevocable proxies to vote at least 42% of the Company's shares in favor of the Proposed Acquisition.

9.    Defendants agreed to these preclusive and coercive deal protection devices despite the fact that at least one competing bidder has shown serious interest in making a bid for the Company. With the deal protections devices in place, however, this bidder and all other competing bidders are now precluded from making competing bids for the Company. Accordingly, without intervention of the Court, the Proposed Acquisition is a *fait accompli.*

10.    In pursuing this unlawful plan to divest the Company's public stockholders of their holdings in the Company at an unfair price and through the implementation of a flawed process, the defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and have aided and abetted such breaches by the Company's officers and directors. Instead of attempting to negotiate a contract reflecting the highest price reasonably

available for the Company's stockholders, defendants spent substantial effort tailoring the Proposed Acquisition to meet their own specific needs and those of JDA.

11.     Because defendants dominate and control the business and corporate affairs of i2 and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of i2, which makes it inherently unfair for them to execute and pursue any proposed merger agreement under which they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

12.     In short, the Proposed Acquisition is designed to unlawfully divest the Company's public stockholders of the valuable assets of the Company for grossly inadequate consideration. Further, the defendants have failed to disclose all material information regarding the Company and its true value.

13.     Plaintiff seeks injunctive relief to prevent defendants from consummating the Proposed Acquisition unless and until they remedy their breaches of fiduciary duty.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with Texas so as to render the exercise of jurisdiction by the Texas courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 5

herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to i2 occurred in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## PARTIES

16.　　Plaintiff John D. Norsworthy is, and at all relevant times was, a shareholder of i2.

17.　　Defendant ██ is a provider of supply chain management solutions, consisting of various software and service offerings. In addition to application software, i2 offers hosted software solutions, such as business optimization and technical consulting, managed services, training, solution maintenance, software upgrades and development. i2 is incorporated under the laws of the State of Delaware and its headquarters are located in Dallas, Texas. Under Article 2.11(A) of the Texas Business Corporation Act, i2 may be served with process by and through its CEO as follows:

██████████ One i2 Place, 11701 Luna Road, Dallas, Texas 75234.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

18.　　Defendant ████████ ("Sidhu") is Chairman Emeritus of i2, and has served on the Board since i2's incorporation in 1989. Sidhu is i2's largest stockholder, and currently owns 21.1% of i2's common shares. ██████ ██ served with process at 27 Dennis Lake Circle, Dallas, Texas ██████.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

19.　　Defendant ████████ Wilson, Jr. ("Wilson") is the Executive Chairman of i2's Board. Wilson may be served with process at ██████████████████████.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

20.　　Defendant ██████ Clemmer ("Clemmer") is a director of i2. Clemmer may be served with process at ████ American Parkway NE, #12F, Allentown, Pennsylvania 18109.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

21.     Defendant ████████ ("Clark") is a director of i2. Clark was appointed to the Board by and is affiliated with Amalgamated. Clark may be served with process at ████████ ████ Dallas, Texas 75205.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

22.     Defendant ████████ Bradley ("Bradley") is a director of i2. Bradley may be served with process at 1█████████ Road, Lexington, Massachusetts 02420.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

23.     Defendant ████████ Waterhouse ("Waterhouse") is a director of i2. Waterhouse may be served with process at 20██ █████ Drive, Park City, Utah 84098.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

24.     Defendant ████████ ("Hunter") is a director of i2. Hunter was appointed to the Board by and is affiliated with Amalgamated. Hunter may be served with process at ███ Logan ████ Road, Georgetown, Texas 78628.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

25.     Defendant ████████ ("Pope") is a director of i2. Pope was appointed to the Board by and is affiliated with Amalgamated. Pope may be served with process at ███ Thames ████ Dallas, Texas 75252.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

26.     Defendant ████████ Simmons ("Simmons") is a director of i2. Simmons was appointed to the Board by and is affiliated with Amalgamated. Simmons may be served with process at 4██ █████ Hill Road, Houston, Texas 77024.

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

27.     Defendant ~~Amalgamated~~ Gadget, L.P. ("Amalgamated") is a Texas limited partnership that holds 100% of the Company's Series B Preferred Shares and a 17.7% voting stake in the Company.  Amalgamated controls the Board through its four representatives on the Board, defendants Clark, Hunter, Pope and Simmons.  Amalgamated may be served with process through its Registered Agent, ~~Capital Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas 78701.~~

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

28.     Defendant ~~JDA Software Group Inc.~~ ("JDA") is a leading provider of sophisticated software solutions designed specifically to address the supply and demand chain requirements of global consumer products companies, manufacturers, wholesale/distributors and retailers, as well as government and aerospace defense contractors and travel, transportation, hospitality and media organizations. JDA has an install base of over 5,600 customers worldwide. JDA is incorporated in Delaware, and has its corporate headquarters in Scottsdale, Arizona.  JDA may be served with process at ~~14400 North 87th Street, Scottsdale, Arizona 85260.~~

SERVICE OF PROCESS IS HEREBY REQUESTED ON THIS DEFENDANT

29.     The defendants named above in ¶¶18-26 are sometimes collectively referred to herein as the "Individual Defendants."

**DEFENDANTS' FIDUCIARY DUTIES**

30.     Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, including a significant premium.  To diligently comply with these duties, neither the directors nor the officers may take any action that:

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 8

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    will discourage, inhibit or deter alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits them from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

31.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of i2, are obligated under Delaware law to refrain from:

(a)    participating in any transaction where the directors' or officers' loyalties are divided;

(b)    participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

32.    Plaintiff alleges herein that the defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith and independence owed to plaintiff and other public shareholders of i2. The Individual Defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class (as defined herein),

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 9

and choosing not to provide shareholders with all information necessary to make an informed decision in connection with the Proposed Acquisition. As a result of the Individual Defendants' self-dealing and divided loyalties, neither plaintiff nor the Class will receive adequate or fair value for their i2 common stock in the Proposed Acquisition.

33.    Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## BACKGROUND TO THE PROPOSED ACQUISITION

34.    i2 is a provider of supply chain management solutions, consisting of various software and service offerings. In addition to application software, i2 offers hosted software solutions, such as business optimization and technical consulting, managed services, training, solution maintenance, software upgrades and development.

35.    i2 is substantially controlled by insiders Sidhu, the Chairman of the Board, and Amalgamated. Collectively, Sidhu and Amalgamated control 38% of the Company's common shares, and 100% of the Company's Series B Preferred stock. Amalgamated controls four seats on the Board, currently staffed by defendants Clark, Hunter, Pope and Simmons. Sidhu and Amalgamated have agreed to vote all their common stock and preferred shares in favor of the Proposed Acquisition.

36.    On March 7, 2007, a shareholder derivative suit, *Keritsis v. McGrath, et al.*, was filed in Delaware Chancery Court. The *Keritsis* suit alleges that defendants Sidhu, Bradley, Clemmer, Waterhouse and Wilson all engaged in stock option backdating in 2004 and 2005.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 10

37.    In July 2007, the Company's then-CEO Michael E. McGrath stepped down, and was replaced by Pallab Chatterjee ("Chatterjee") on an interim basis.

38.    Until April 30, 2007, i2's stock traded above $26 per share, substantially above the sale price defendants agreed to in the Proposed Acquisition. However, i2 stock – paralleling the overall market – temporarily declined to as low as $13.86 per share in September 2007.

39.    On October 23, 2007, a shareholder derivative suit, *McFadden v. Sidhu, et al.*, was filed in Delaware Chancery Court. The *McFadden* suit alleges that defendants Sidhu, Bradley, Clemmer, Waterhouse and Wilson breached their fiduciary duties in connection with the sale of the Company's subsidiary, Trade Services Corporation, for an unfair price in 2005.

40.    Thereafter, Amalgamated and a second large i2 investor, SAC Capital Advisors, began agitating for a sale of the Company. Because of Amalgamated's presence on the Board, it was able to convince the rest of the Board to pursue a possible sale of the Company.

41.    Accordingly, on November 1, 2007, defendants announced that they had formed a committee of purportedly independent directors to consider a sale of the Company, and had retained J.P. Morgan Securities, Inc. to assist the Company in its strategic review. The purportedly independent committee, dubbed the "strategic transaction committee," consists of defendants Clemmer, Waterhouse and Wilson, all of who are defendants to the outstanding shareholder derivative suits.

42.    The Board's strategic review process was announced the same day as the Company reported positive financial results in a press release entitled "i2 reports Third Quarter 2007 Results." i2 reported:

- Total revenue was $66.5 million
- Total costs and expenses were $58.9 million

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 11

- Net income applicable to common stockholders was $4.5 million

- Diluted earnings per share (GAAP) were $0.17

- Non-GAAP diluted earnings per share were $0.24 (excluding stock option expense and contract revenue)

- Cash flow from operations was $2.9 million

- Total bookings of $46.5 million, including $7.0 million in software solutions bookings

"i2ers worked hard to deliver solid results in the third quarter," stated i2 Interim Chief Executive Officer Pallab Chatterjee. "We are particularly pleased with significant customer wins from our retail and logistics solutions, and the continued momentum we are experiencing in our services business, where we achieved the highest level of quarterly revenue in the last three years. Although the third quarter is a seasonally low quarter for bookings, our total bookings were lower than our expectations and we hope to increase our sales velocity in the fourth quarter," concluded Chatterjee.

"We are reporting solid financial performance for the third quarter, highlighted by continued growth in our services business and positive cash flow from operations," stated i2 Executive Vice President and Chief Financial Officer Mike Berry. "Given our stronger than expected results in the third quarter and our current outlook for the fourth quarter, we are revising our current outlook for full-year 2007," concluded Berry.

**Third Quarter Results**

Revenue Detail

Total revenue for the third quarter was $66.5 million as compared to $71.4 million in the third quarter of 2006, a decrease of $4.9 million or 7 percent. Total revenue in the third quarter of 2006 included contract revenue of $33,000.

i2 had total third quarter software solutions revenue, which includes core license revenue, recurring license revenue as well as fees received to develop the licensed functionality, of $10.5 million. This compares to $20.6 million of software solutions revenue in the third quarter of 2006, a decline of 49 percent year-over-year. Recurring license revenue in the third quarter of 2006 included $5.2 million related to platform technology bookings recorded in the second quarter of 2006.

Services revenue in the third quarter was $33.4 million, an increase of 24 percent from the $27.0 million of services revenue in the third quarter of 2006. Services revenue includes fees received from consulting and training services as well

as arrangements to customize or enhance previously purchased licensed software. Services revenue also includes reimbursable expenses.

Third quarter maintenance revenue was $22.6 million, a decrease of 5 percent from $23.7 million in the comparable prior year quarter.

*Costs and Expenses*

Total costs and expenses for the third quarter of 2007 were $58.9 million, a decrease of 9 percent compared to $64.7 million in the third quarter of 2006. Total costs and expenses in the third quarter of 2007 included $3.9 million in restructuring charges related to the company's reorganization plan implemented in July. Total costs and expenses in the third quarter of 2007 also included $2.3 million in stock-based compensation expense, which includes $1.8 million in expense related to stock options and $500,000 in expense related to restricted stock units.

*Net Income*

The company reported third quarter 2007 net income applicable to common stockholders of $4.5 million, or $0.17 per diluted share. This compares to $3.8 million, or $0.15 per diluted share, in net income applicable to common stockholders in the third quarter of 2006.

**Nine Month Results**

For the nine months ended September 30, 2007, total revenues were $197.0 million, a decrease of 2 percent as compared to $200.1 million for the same period in 2006. Total revenue for the nine months ended September 30, 2007 included $2.5 million of contract revenue compared to $99,000 of contract revenue in the comparable prior-year period.

Software solutions revenue decreased 33 percent to $35.4 million for the nine months ended September 30, 2007 compared to $52.9 million for the nine months ended September 30, 2006. Services revenue was $93.6 million for the nine months ended September 30, 2007 compared to $77.0 million in the same period in 2006, an increase of 22 percent. Maintenance revenue decreased 6 percent to $65.6 million in the nine months ended September 30, 2007 compared to $70.1 million in the comparable period in 2006.

Total costs and expenses for the nine months ended September 30, 2007 decreased 2 percent to $180.7 million as compared to $185.2 million in the comparable period of 2006. Total costs and expenses for the nine months ended September 30, 2007 included $9.7 million in stock-based compensation expense, which includes $7.9 million in expense related to stock options and $1.7 million in expense related to restricted stock units.

The company reported net income applicable to common stockholders of $9.6 million or $0.36 per diluted share for the nine months ended September 30, 2007. This compares to $7.0 million or $0.27 per diluted share in net income applicable to common stockholders in the comparable period in 2006.

**Non-GAAP Diluted Earnings Per Share**

The company provides non-GAAP financial measures to assist stockholders with the analysis of financial and business trends related to the company's operations. These calculations are not in accordance with, or an alternative for, generally accepted accounting principles (GAAP) and may be different from non-GAAP measures presented by other companies.

Non-GAAP diluted earnings per share applicable to common stockholders in the third quarter of 2007 were $0.24, compared to $0.28 per diluted share in the comparable period last year on a non-GAAP basis. Non-GAAP diluted earnings per share applicable to common stockholders for the nine months ended September 30, 2007 were $0.56, compared to $0.74 per diluted share in the comparable period in 2006 on a non-GAAP basis. Non-GAAP diluted earnings per share excludes stock option expense and the net effect of contract revenue and contract expense. Contract revenue is the result of the recognition of certain revenue that was carried on i2's balance sheet as a portion of deferred revenue and was a result of the company's 2003 financial restatement. As of March 31, 2007, the deferred contract revenue balance was zero.

\*     \*     \*

**Other Financial Information**

On September 30, 2007, i2's total cash was $121.0 million (including restricted cash of $6.4 million). Total debt at the end of the third quarter was $86.3 million, which represents the face value of the company's 5% senior convertible notes.

The company generated cash flow from operations of $2.9 million in the third quarter of 2007 versus negative cash flow from operations of $3.3 million in the third quarter of 2006. For the nine months ended September 30, 2007, cash flow from operations was $8.0 million versus $8.8 million in the comparable period of 2006.

**Full Year 2007 Outlook**

Entering the fourth quarter, the company is adjusting its previously provided full year outlook for 2007. Revenue in the fourth quarter of 2007 is expected to be slightly higher than the third quarter of 2007 amount. Therefore, for full year 2007, total revenue is expected to be between $263.5 million and $266.5 million. Excluding the recognition of the last $2.5 million in contract revenue during the first quarter of 2007, operating revenue for the full year of 2007 is expected to be between

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 14

$261 million and $264 million. For the full year 2007, the company currently expects cash flow from operations to be reasonably comparable to the full year 2006 amount and total bookings to be below the full year 2006 amount.

Based on the revised revenue expectation, the company currently estimates GAAP diluted earnings per share for full year 2007 to be in the range of $0.55 to $0.65 per fully diluted share. Non-GAAP earnings per share, which excludes stock option expense and the net effect of contract revenue and contract expense, are expected to be in the range of $0.82 to $0.92 per fully diluted share.

43.     On the heels of this positive news, the Company's stock price rose to $18.48 per share, and traded above the consideration offered in the Proposed Acquisition until December 6, 2007.

44.     Thereafter, the Company continued to report positive financial results although, reflecting overall economic trends, the Company's stock price continued to trade down. For example, on January 24, 2008, the Company announced preliminary fourth quarter and full year 2007 results that included cash from operations of $8-$9 million for the fourth quarter of 2007, and $16-$17 million for full year 2007.

45.     The Company announced its final fourth quarter and full year 2007 results two weeks later, in a press release entitled "i2 Reports Fourth Quarter and Fiscal Year 2007 Results." The Company reported:

**A summary of fourth quarter results**:

- Total revenue was $63.3 million

- Total costs and expenses were $54.5 million

- Net income applicable to common stockholders was $5.0 million

- Diluted earnings per share (GAAP) were $0.19

- Non-GAAP diluted earnings per share were $0.26 (excluding stock option expense and contract revenue)

- Cash flow from operations was $8.4 million

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 15

- Total bookings of $81.8 million, including $21.9 million in software solutions bookings

**A summary of fiscal year 2007 results:**

- Total revenue was $260.3 million

- Total costs and expenses were $235.2 million

- Net income applicable to common stockholders was $14.7 million

- Diluted earnings per share (GAAP) were $0.55

- Non-GAAP diluted earnings per share were $0.82 (excluding stock option expense and contract revenue)

- Cash flow from operations was $16.4 million

- Total bookings of $264.7 million, including $54.6 million in software solutions bookings

"We ended 2007 with strong bookings performance, recording the highest level of quarterly bookings in the last three years," stated i2 Interim Chief Executive Officer Pallab Chatterjee. "The fourth quarter was highlighted by more than $81 million in total bookings, which included approximately $22 million in software solutions bookings. We are pleased to continue our relationships with many current customers who renewed agreements during the quarter and we look forward to growing our relationships with the new customers we signed during the quarter."

"We are pleased to have recorded significant bookings during the fourth quarter which resulted in growth in total bookings for full year 2007 compared to the prior year period," stated i2 Executive Vice President and Chief Financial Officer Mike Berry. "While our revenue and earnings results were below our expectations in the fourth quarter, we exceeded our cash flow expectations and are pleased with the continued improvement in our liquidity," concluded Berry.

**Fourth Quarter Results**

*Revenue Detail*

Total revenue for the fourth quarter was $63.3 million as compared to $79.6 million in the fourth quarter of 2006, a decrease of $16.3 million or 21 percent. Total revenue in the fourth quarter of 2006 included contract revenue of $4.0 million.

i2 had total fourth quarter software solutions revenue, which includes core license revenue, recurring license revenue as well as fees received to develop the licensed functionality, of $12.4 million. This compares to $23.4 million of software

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 16

solutions revenue in the fourth quarter of 2006, a decline of 47 percent year-over-year. Note: the fourth quarter 2006 software solutions revenue amount includes $5.2 million in recurring license revenue related to platform technology bookings recorded in 2006.

Services revenue in the fourth quarter was $29.1 million, a decrease of 1 percent from the $29.5 million of services revenue in the fourth quarter of 2006. Services revenue includes fees received from consulting and training services as well as arrangements to customize or enhance previously purchased licensed software. Services revenue also includes reimbursable expenses.

Fourth quarter maintenance revenue was $21.9 million, a decrease of 4 percent from $22.7 million in the comparable prior year quarter.

*Costs and Expenses*

Total costs and expenses for the fourth quarter of 2007 were $54.5 million, a decrease of 16 percent compared to $65.1 million in the fourth quarter of 2006. Total costs and expenses in the fourth quarter of 2007 included $2.7 million in stock-based compensation expense, which includes $1.9 million in expense related to stock options and $800,000 in expense related to restricted stock units.

*Net Income*

The company reported fourth quarter 2007 net income applicable to common stockholders of $5.0 million, or $0.19 per diluted share. This compares to $14.3 million, or $0.54 per diluted share, in net income applicable to common stockholders in the fourth quarter of 2006.

**Fiscal Year 2007 Results**

Total revenues for 2007 were $260.3 million, a decrease of 7 percent as compared to $279.7 million for the same period in 2006. Total revenue included contract revenue of $2.5 million and $4.1 million in 2007 and 2006, respectively.

Software solutions revenue decreased 37 percent to $47.7 million in 2007 compared to $76.2 million in 2006. Services revenue was $122.7 million compared to $106.5 million in 2006, an increase of 15 percent. Maintenance revenue decreased 6 percent to $87.5 million in 2007 compared to $92.8 million in 2006.

Total costs and expenses for 2007 declined 6 percent to $235.2 million as compared to $250.3 million in 2006. Total costs and expenses in 2007 included $12.4 million in stock-based compensation expense, which includes $9.8 million in expense related to stock options and $2.6 million in expense related to restricted stock units.

The company reported net income applicable to common stockholders of $14.7 million or $0.55 per diluted share for 2007. This compares to $21.3 million or $0.82 per diluted share in net income applicable to common stockholders in 2006.

### Non-GAAP Diluted Earnings Per Share

The company provides non-GAAP financial measures to assist stockholders with the analysis of financial and business trends related to the company's operations. These calculations are not in accordance with, or an alternative for, generally accepted accounting principles (GAAP) and may be different from non-GAAP measures presented by other companies.

Non-GAAP diluted earnings per share applicable to common stockholders in the fourth quarter of 2007 were $0.26, compared to $0.52 per diluted share in the comparable period last year on a non-GAAP basis. Non-GAAP diluted earnings per share applicable to common stockholders for 2007 were $0.82, compared to $1.27 per diluted share in 2006 on a non-GAAP basis. Non-GAAP diluted earnings per share excludes stock option expense and the net effect of contract revenue and contract expense. Contract revenue is the result of the recognition of certain revenue that was carried on i2's balance sheet as a portion of deferred revenue and was a result of the company's 2003 financial restatement. As of March 31, 2007, the deferred contract revenue balance was zero.

*        *        *

### Other Financial Information

On December 31, 2007, i2's total cash was $129.4 million (including restricted cash of $8.5 million). Total debt at the end of 2007 was $86.3 million, which represents the face value of the company's 5% senior convertible notes.

The company generated cash flow from operations of $8.4 million in the fourth quarter of 2007. For 2007, cash flow from operations was $16.4 million versus $14.8 million in 2006.

### First Quarter 2008 Outlook

In conjunction with the continuing efforts of the strategic review committee, the company is providing outlook for only the first quarter of 2008 at this time. The company currently expects financial performance in the first quarter of 2008 to be reasonably comparable to the first quarter of 2007, excluding the effect of contract revenue recorded in the prior year period. However, cash flow from operations in the first quarter of 2008 is expected to be positive compared to the negative $6.6 million of cash flow from operations in the prior year period. This outlook assumes no significant changes to the company's management or operations during the first quarter of 2008.

46.     The same day, the Company announced that it had decided to continue its strategic review process.

47.     On February 12, 2008, Amalgamated filed a Form 14A with the Securities and Exchange Commission ("SEC"), stating Amalgamated's position that it was the right time to sell the Company. Amalgamated also used the Form 14A filing as a vehicle to seek support for election of defendants Clark and Hunter to the Board to replace outgoing directors McGrath and Harvey B. Cash, who had determined not to stand for reelection at the Company's next annual meeting. With election of Clark and Hunter, Amalgamated would control four Board seats, and be able to direct a sale of the Company without facing any possible resistance.

48.     On February 22, 2008, the Company announced that the Board's nominating and corporate governance committee had recommended that Clark and Hunter be elected to the Board to replace McGrath and Cash.

49.     On April 28, 2008, the Company issued a Definitive Proxy statement on Form 14A recommending that shareholders vote to elect Clark and Hunter to the Board at the Company's annual meeting scheduled for May 29, 2008.

50.     On May 6, 2008, the Company announced a continued upswing in its financial prospects in a press release entitled "i2 Reports First Quarter 2008 Results." The Company reported:

A summary of first quarter results:

- Total revenue was $62.6 million

- Total costs and expenses were $58.5 million

- Net income applicable to common stockholders was $2.6 million

- Diluted earnings per share (GAAP) were $0.10

- Non-GAAP diluted earnings per share were $0.17 (excluding stock option expense and contract revenue)

- Cash flow from operations was $8.9 million

- Total bookings of $66.4 million, including $8.6 million in software solutions bookings

- Signed first multi-year, operations services agreement with a European high-tech customer with a contract value over $10 million (amount is not included in first quarter 2008 total bookings due to contractual contingencies)

"We are pleased with our performance in the first quarter as well as the continued progress we have made in our strategy as The Supply Chain Results Company," stated i2 Interim Chief Executive Officer Pallab Chatterjee. "We recorded the highest amount of first quarter bookings in the last three years and recorded year-over-year growth for the quarter in all of our bookings categories. Last week at i2 Planet, we introduced SCM 2.0, a new paradigm within supply chain operations that combines domain expertise, process innovation and proven tools to make business plans happen. We are encouraged by the interest generated among our existing customers as well as potential new customers during our Planet conference," concluded Chatterjee.

"We are reporting solid financial results for the first quarter highlighted by year-over-year growth in maintenance revenue and strong cash flow from operations," stated i2 Executive Vice President and Chief Financial Officer Mike Berry. "We are very pleased to have now recorded four consecutive quarters of positive cash flow from operations and two straight quarters of year-over-year bookings growth," concluded Berry.

**First Quarter Results**

*Revenue Detail*

Total revenue for the first quarter was $62.6 million as compared to $65.6 million in the first quarter of 2007, a decrease of $3.0 million or 5 percent. Total revenue in the first quarter of 2007 included contract revenue of $2.5 million.

i2 had total first quarter software solutions revenue, which includes core license revenue, recurring license revenue as well as fees received to develop the licensed functionality, of $11.7 million. This compares to $13.4 million of software solutions revenue in the first quarter of 2007, a decline of 13 percent year-over-year.

Services revenue in the first quarter was $28.8 million, an increase of 1 percent from the $28.7 million of services revenue in the first quarter of 2007. Services revenue includes fees received from consulting and training services as well as arrangements to customize or enhance previously purchased licensed software. Services revenue also includes reimbursable expenses.

First quarter maintenance revenue was $22.1 million, an increase of 5 percent from $21.0 million in the comparable prior year quarter.

*Costs and Expenses*

Total costs and expenses for the first quarter of 2008 were $58.5 million, a decrease of 3 percent compared to $60.1 million in the first quarter of 2007. Total costs and expenses in the first quarter of 2008 included $2.9 million in stock-based compensation expense, which includes $2.0 million in expense related to stock options and $900,000 in expense related to restricted stock units.

*Net Income*

The company reported first quarter 2008 net income applicable to common stockholders of $2.6 million, or $0.10 per diluted share. This compares to $3.5 million, or $0.13 per diluted share, in net income applicable to common stockholders in the first quarter of 2007.

**Non-GAAP Diluted Earnings Per Share**

The company provides non-GAAP financial measures to assist stockholders with the analysis of financial and business trends related to the company's operations. These calculations are not in accordance with, or an alternative for, generally accepted accounting principles (GAAP) and may be different from non-GAAP measures presented by other companies.

Non-GAAP diluted earnings per share applicable to common stockholders in the first quarter of 2008 were $0.17, compared to $0.16 per diluted share in the comparable period last year on a non-GAAP basis. Non-GAAP diluted earnings per share excludes stock option expense and the net effect of contract revenue and contract expense. Contract revenue is the result of the recognition of certain revenue that was carried on i2's balance sheet as a portion of deferred revenue and was a result of the company's 2003 financial restatement. As of March 31, 2007, the deferred contract revenue balance was zero.

\*      \*      \*

**Other Financial Information**

On March 31, 2008, i2's total cash balance was $138.9 million (including restricted cash of $7.3 million), an increase of $9.4 million from December 31, 2007. Total debt at the end of the first quarter was $86.3 million, which represents the face value of the company's 5% senior convertible notes.

The company generated cash flow from operations of $8.9 million in the first quarter of 2008. The company has recorded approximately $32 million in cash flow from operations during the trailing four quarter period.

**Second Quarter 2008 Outlook**

The company currently expects financial performance in the second quarter of 2008 to be reasonably comparable to the first quarter of 2008, excluding the effect of incremental investment in the company's patent litigation lawsuits as well as higher income tax expense. The company currently expects total revenue to increase sequentially due primarily to higher services revenue. Sales and marketing expenses are expected to be slightly higher due to the company's annual i2 Planet conference in the second quarter. Cash flow from operations in the second quarter of 2008 is expected to be positive, however less than the first quarter of 2008 amount. This outlook assumes no significant changes to the company's management or operations during the second quarter of 2008.

51.     On May 7, 2008, the Company reported that Sidhu was stepping down as Chairman of the Board but would continue to serve as Chairman Emeritus and remain on the Board. The Company also announced that Wilson was stepping up to serve as Executive Chairman of the Board.

52.     Also on May 7, 2008, the Company held a conference call to update shareholders on the status of the strategic review process. On the call, defendant Sidhu commented on the strong economic outlook for the Company:

Over the past two years our financial condition has continuously improved. We reduced our GAAP total costs and expenses by 11% and 6% in 2006 and 2007 respectively. When our cash flow was positive during these two years, the results were suppressed as we worked through the indemnification obligations and other legacy issues.

Largely as a result of our focus on operational efficiency, our ability to generate positive cash flow has increased significantly. We have generated approximately $32 million in positive cash flow from operations over the last four quarters.

We exit the first quarter of 2008 with nearly $139 million in total cash balances, which is $53 million more cash . . . than the face value of our convertible debt. Our solid operating results can also be seen in our increase in working capital. This important liquidity measure has increased from a negative $34 million at the end of 2005 to a positive $74 million at the end of first quarter of 2008, a tremendous improvement.

\*          \*          \*

While the company has been focused on building a framework for growth, our results in this area have clearly been less than satisfactory. For 2006 and 2007

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 22

operating revenues declined. Then during the third quarter of 2007 we made the decision to alter our direction to better serve changing customer needs. The benefit of this refocus was seen during the last two quarters, as total company bookings increased year-over-year by 28% and 8% during the fourth quarter of 2007 and the first quarter of 2008 respectively.

These bookings have resulted in an increase in our total backlog of more than $20 million since the end of third quarter of 2007. In addition, we signed our first long-term operations services contract with a major i2 customer during the first quarter of 2008. This contract has a value of over $10 million for the initial three-year term of the agreement and is another proof point to our capability to focus on delivering differentiated supply chain results. This contract was not reflected in the first quarter 2008 reported bookings.

53.     Subsequently on the call, defendant Wilson, who had just been appointed Executive

Chairman, explained some of the issues that the strategic transaction committee was focused on

during its review, which included consideration of the Company's $1.8 billion in outstanding

NOL's, and patent portfolio of "significant value" that the Company was in the process of

monetizing through litigation and licensing.

54.     Further, Wilson pointed out two issues that could "represent significant dilution" for

i2 common stock shareholders in a change of control transaction, including the fact that

Amalgamated's "Series B Preferred Stock would be eligible to receive 110% of their original

investment plus paid-in-kind dividends in cash," and "[t]he majority of the options and restricted

stock units held by management and employees would immediately accelerate and vest."

55.     Wilson explained that the strategic transaction committee was considering both

maintaining the Company as a stand-alone or an outright sale. Wilson noted that i2 "has

demonstrated over the past quarters that it can continue to compete in the marketplace as a stand-

alone company." Wilson also disclosed that the Company was in serious discussion with at least

two competing bidders for a possible sale.

56.     Wilson further explained that the strategic review committee was also considering selling the Company's operational assets and forming a holding company to monetize the Company's extensive NOL and patent assets for shareholders. Wilson noted, however, that the Company's outstanding Series B Preferred Shares presented a significant obstacle to this option.

57.     On May 13, 2008, the Company announced that Chatterjee would be named the Company's CEO, removing the "interim" tag.

58.     On May 29, 2008, following the Company's annual meeting, the Company announced that Amalgamated representatives Clark and Hunter had been elected to the Board, thus giving Amalgamated the power on the Board that it needed to force a sale of the Company and monetize the value of its preferred shares.

59.     On June 23, 2008, the Company announced that it had settled patent litigation with SAP America, Inc. As part of the settlement, i2 will receive a cash payment of $83.3 million. The Company further reported that the settlement would have a positive effect on its second quarter 2008 performance, thus upwardly revising the guidance the Company had provided in connection with the release of its first quarter 2008 financials.

60.     On August 7, 2008, the Company announced its second quarter 2008 financial results, which included the positive financial impact of the SAP patent litigation settlement. The Company reported:

- Total revenue was $64.7 million

- Costs and expenses, excluding intellectual property settlement benefit, were $60.7 million

- Total operating expense benefit, including intellectual property settlement, of $20.6 million

- Net income applicable to common stockholders was $80.7 million

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY -- Page 24

- Diluted earnings per share (GAAP) were $3.05

- Non-GAAP diluted earnings per share were $0.03 (excluding stock option expense, contract revenue and intellectual property settlement, net of taxes)

- Cash flow from operations was $11.5 million

- Total bookings of $64.1 million, including $8.3 million in software solutions bookings

**Intellectual property settlement**

During the second quarter, the company announced a settlement agreement with SAP America, Inc. and SAP AG to settle the existing patent litigation between the companies. Under the terms of the settlement agreement, each party will license to the other certain patents in exchange for a one-time cash payment to i2 of $83.3 million. The settlement was recorded as a benefit to the second quarter operating expenses, net of approximately $2.0 million in external patent litigation expenses incurred in the quarter. The company also recorded approximately $1.4 million of alternative minimum tax (AMT) and other state taxes in the quarter as a result of the settlement. The company received the $83.3 million payment on July 28, 2008.

*    *    *

"Our Supply Chain Results Company strategy, and our introduction of SCM 2.0, continues to build momentum, with both new and existing customers turning to us for flexible solutions, rapid delivery and supply chain expertise," stated i2 Chief Executive Officer Pallab Chatterjee. "In addition, we believe that our intellectual property settlement with SAP validates the value of our intellectual property," concluded Chatterjee.

"We are reporting solid bookings and strong cash flow from operations for the second quarter," stated i2 Executive Vice President and Chief Financial Officer Mike Berry. "Included in the financial results for the second quarter is approximately $79.9 million, net of external patent litigation expenses and the impact of taxes, related to our intellectual property settlement with SAP as well as $1.8 million of costs related to other litigation items, dating back to 2005, resolved during the quarter," concluded Berry.

**Second Quarter Results**

*Revenue Detail*

Total revenue for the second quarter was $64.7 million as compared to $65.0 million in the second quarter of 2007, a decrease of $0.3 million or 0.4 percent.

i2 had total second quarter software solutions revenue, which includes core license revenue, recurring license revenue as well as fees received to develop the licensed functionality, of $12.6 million. This compares to $11.4 million of software solutions revenue in the second quarter of 2007, an increase of 10 percent year-over-year.

Services revenue in the second quarter was $30.5 million, a decrease of 3 percent from the $31.6 million of services revenue in the second quarter of 2007. Services revenue includes fees received from consulting and training services as well as arrangements to customize or enhance previously purchased licensed software. Services revenue also includes reimbursable expenses.

Second quarter maintenance revenue was $21.7 million, a decrease of 2 percent from $22.0 million in the comparable prior year quarter.

*Costs and Expenses*

Costs and expenses, subtotal excluding the intellectual property settlement, for the second quarter of 2008 were $60.7 million, a 2 percent decrease compared to $61.7 million in the second quarter of 2007. Costs and expenses in the second quarter included $3.0 million in stock-based compensation expense, which includes $2.0 million in expense related to stock options and $1.0 million in expense related to restricted stock units. Second quarter costs and expenses also included $1.8 million related to resolutions of certain outstanding litigations from 2005.

Including the $81.3 million intellectual property settlement, net of approximately $2.0 million in external patent litigation expenses, total costs and expenses for the second quarter of 2008 were a benefit of $20.6 million.

*Net Income*

The company reported second quarter 2008 net income applicable to common stockholders of $80.7 million, or $3.05 per diluted share. This compares to $1.6 million, or $0.06 per diluted share, in net income applicable to common stockholders in the second quarter of 2007.

**First Half 2008 Results**

For the six months ended June 30, 2008, total revenues were $127.3 million, a decrease of 3 percent as compared to $130.6 million for the same period in 2007. Total revenue in the first half of 2007 included $2.5 million of contract revenue. Excluding contract revenue, operating revenue declined 1 percent for the six months ended June 30, 2008 compared to the same period in 2007.

Software solutions revenue decreased 2 percent to $24.2 million for the six months ended June 30, 2008 compared to $24.8 million in the first half of 2007. Services revenue was $59.4 million in the first half of 2008 compared to $60.2

million in the first half of 2007, a decrease of 1 percent. Maintenance revenue increased 2 percent to $43.7 million in the first half of 2008 compared to $43.0 million in the comparable period in 2007.

Costs and expenses, subtotal excluding the intellectual property settlement, for the six months ended June 30, 2008 decreased 3 percent to $117.8 million as compared to $121.8 million in the first half of 2007. Costs and expenses for the six months ended June 30, 2008 included $5.9 million in stock-based compensation expense, which includes $4.0 million in expense related to stock options and $1.9 million in expense related to restricted stock units. Total costs and expenses for the six months ended June 30, 2008 were $37.9 million and included a benefit of $79.9 million related to the company's intellectual property settlement. The benefit amount reflects the $83.3 million gross amount of the settlement, net of $3.5 million in external patent litigation related expenses.

The company reported net income applicable to common stockholders of $83.3 million or $3.15 per diluted share for the six months ended June 30, 2008. This compares to $5.1 million or $0.19 per diluted share in net income applicable to common stockholders in the comparable period in 2007.

**Non-GAAP Diluted Earnings Per Share**

The company provides non-GAAP financial measures to assist stockholders with the analysis of financial and business trends related to the company's operations. These calculations are not in accordance with, or an alternative for, generally accepted accounting principles (GAAP) and may be different from non-GAAP measures presented by other companies.

Non-GAAP diluted earnings per share applicable to common stockholders in the second quarter of 2008 were $0.03, compared to $0.17 per diluted share in the comparable period last year on a non-GAAP basis. Non-GAAP diluted earnings per share applicable to common stockholders for the six months ended June 30, 2008 were $0.20, compared to $0.33 per diluted share in the comparable period in 2007 on a non-GAAP basis. Non-GAAP diluted earnings per share excludes stock option expense, the net effect of contract revenue and contract expense and the effect of the intellectual property settlement, net of the impact of taxes applicable to the settlement. Contract revenue is the result of the recognition of certain revenue that was carried on i2's balance sheet as a portion of deferred revenue and was a result of the company's 2003 financial restatement. As of March 31, 2007, the deferred contract revenue balance was zero.

**Other Financial Information**

On June 30, 2008, i2's total cash balance was $149.7 million (including restricted cash of $6.7 million), an increase of $10.9 million from March 31, 2008. Total debt at the end of the second quarter was $86.3 million, which represents the face value of the company's 5% senior convertible notes.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 27

The company generated cash flow from operations of $11.5 million in the second quarter of 2008, bringing the first half 2008 cash flow from operations to $20.4 million. The company has recorded approximately $32 million in cash flow from operations during the trailing four quarter period.

**Third Quarter 2008 Outlook**

The company currently expects financial performance in the third quarter of 2008 to be reasonably comparable to the third quarter of 2007. Cash flow from operations in the third quarter of 2008 is expected to be greater than $80 million due to the cash received from the company's patent litigation settlement with SAP, net of external related expense cash payments. This outlook assumes no significant changes to the company's management or operations during the third quarter of 2008.

## THE PROPOSED ACQUISITION

61. The Company's common stockholders will be denied the benefits of the Company's strong second quarter 2008 results, however, as well as any share in the future value of the Company to be generated through its NOL's and patent portfolio. Just four days after announcing these stellar results, defendants artificially capped the Company's stock price by announcing the Proposed Acquisition.

62. On August 11, 2008, defendants announced that i2 had entered in a merger agreement with JDA in press release entitled "JDA Software Group to Acquire i2 Technologies," which stated, in relevant part:

JDA Software Group Inc. and i2 Technologies, Inc. today announced the signing of a definitive merger agreement for JDA Software to acquire i2 Technologies, Inc., a leading global provider of supply chain solutions, for an enterprise value of approximately $346 million in cash. The combination of the two companies creates a global leader in the supply chain planning and optimization market. On a pro-forma trailing 12-month basis, the combined company has annual revenues of $635 million, including nearly $300 million of annual maintenance and recurring subscription fees.

According to JDA Chief Executive Officer Hamish Brewer, the i2 acquisition completes the picture for JDA in the supply chain planning and optimization market.

"By acquiring i2 we double our addressable market in manufacturing to include discrete manufacturing, complementing our current market leadership in

process manufacturing and strengthening our retail and transportation management presence. A major player in the supply chain space for more than 20 years, i2's world-class customers and employees are the perfect match for JDA. With the experience gained from the successful acquisition of Manugistics in 2006, the addition of i2 is comparatively an incremental and logical step for JDA," commented Brewer. "We are confident in our abilities to execute and deliver on projected synergies creating significant incremental shareholder value."

"In an industry that continues to consolidate, scale matters. In that regard, the combination of these two companies will create one of the world's strongest, best-of-breed software solution providers focused on the global supply chain," commented Dr. Pallab Chatterjee, i2 Chief Executive Officer. "The combination of i2 and JDA increases the opportunity for expanded expertise, accelerated innovation and even greater value delivery through the joining of some of the best solutions and brightest minds in the industry."

**Snapshot of Combined Company**

By combining JDA and i2, the resulting company will have significantly improved operating leverage and a strong financial position. The near-term cost synergies identified in operations, general, administrative and infrastructure resulting from this combination are expected to produce annual cost savings of approximately $20 million. As a result of the pending Merger, i2 is withdrawing its previously provided outlook for third quarter 2008.

"In order to avoid equity dilution and maximize our shareholder value, JDA will finance the acquisition using debt. Credit Suisse and Wachovia will be financing the deal," commented Kristen Magnuson, JDA's Executive Vice President and Chief Financial Officer. "Consistent with our strategy after the Manugistics acquisition, we will use our significantly expanded cash flow from operations to de-lever as quickly as possible."

\*       \*       \*

**Terms of the Transaction**   Under the terms of the merger agreement, each issued and outstanding share of i2's common stock will be converted into the right to receive $14.86 per share in cash and each issued and outstanding share of i2's Series B Convertible Preferred Stock will be converted into the right to receive $1,095.3679 per share in cash plus all accrued and unpaid dividends (the "Merger"). In addition, upon consummation of the Merger the vesting of each outstanding option and restricted stock award for common stock of i2 will accelerate in full and the holders of such equity awards will be entitled to receive $14.86 per share less the exercise price of such equity awards, if any.

\*       \*       \*

**Voting Agreements**

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 29

JDA has entered into voting agreements with certain directors and executive officers of i2 and with a significant stockholder of i2, pursuant to which such signatories have agreed to vote in favor of the Merger agreement and against any other proposal or offer to acquire i2. The voting agreements apply to all shares of i2 common stock and Series B Convertible Preferred Stock held by the signatories at the record date for the relevant i2 stockholder meeting. The voting agreements restrict the transfer of shares by the signatories, except under certain limited conditions.

## Consent and Conversion Agreements

Concurrent with the execution of the merger agreement, i2 entered into a Consent and Conversion Agreement ("Conversion Agreement") with Highbridge International LLC ("Highbridge") as the holder of a majority or more of its outstanding 5% Senior Convertible Notes ("Notes") due 2015. In return for i2's agreement to pay Highbridge a payment of $86.9565 per $1,000 principal amount of Notes ("Consent Premium"), Highbridge has agreed as of the effective time of the Merger, to waive the application of and amend the indenture for the Notes to remove certain covenants and further to convert the Notes at, or within 30 trading days of, the effective time of the merger into cash as provided in the indenture, together with a make whole premium, as provided in the indenture as well as interest through the date of conversion. One-third of the Consent Premium due to Highbridge will be paid by i2 prior to August 13, 2008, with such amount being non-refundable, and the balance will be payable at the effective time of the Merger. Pursuant to the Conversion Agreement, Highbridge also agreed to convey its warrants to i2 as of the effective time of the Merger pursuant to the terms of the warrant agreement. The merger agreement obligates i2 to offer similar arrangements to all holders of the Notes to be effective as of the effective time of the Merger.

## Consent Agreement with Thoma Cressey Bravo Funds

Concurrent with the execution of the Merger Agreement, we also entered into a Consent and Agreement (the "Consent Agreement") with Thoma Cressey Bravo Funds, as the holders of our Series B Convertible Preferred Stock (the "Series B Stock") to among other things, agree to the terms and conditions of a Certificate of Amendment to the Certificate of Designations for the Series B Stock to be filed and effective in connection with the closing of the Merger (the "Certificate of Amendment"). The Certificate of Amendment provides for the accrual of cash dividends payable to the holders of the Series B Stock at an annual rate of 12% compounding quarterly during any period after September 6, 2013 if we are unable to redeem the Series B Stock as a result of a prohibition under the debt financing arrangements (the "Dividend"). This accrued but unpaid Dividend is payable upon the redemption of the Series B Stock. This obligation to accrue the Dividend terminates on September 6, 2017 after which time we will be unconditionally obligated to redeem the Series B Stock upon the request of the holders of such stock.

Citi acted as exclusive financial advisor to JDA and DLA Piper US LLP acted as JDA's legal counsel. J.P. Morgan Securities Inc. acted as exclusive financial advisor to i2 and Munsch Hardt Kopf & Harr, P.C. acted as i2's legal counsel.

63.     As part of the Proposed Acquisition, Amalgamated with receive $118 million for its Preferred Shares as compared to only $343 million for the Company's common stockholders.

64.     Notably, JDA intends to finance the Proposed Acquisition in part with the Company's own cash on hand.

65.     Defendants have also agreed to lock-up the Proposed Acquisition through the use of onerous deal protection devices that preclude competing bidders from making a successful bid for the Company to compete with the unfair Proposed Acquisition. Specifically, as part the Merger Agreement with JDA, defendants agreed to: (i) a "poison pill" lockup that prevents any competing bidder from making a tender offer for the Company directly to its sharehholders; (ii) pay JDA a termination fee of $15 million in the unlikely event that a superior proposal for the Company is accepted by the conflicted Board; (iii) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (iv) a "matching rights" provision that allows JDA three days to match any superior proposal; (v) a provision that precludes the Board from waiving the terms of any existing standstill provision except under very limited circumstances; and (vi) voting agreements that amount to irrevocable proxies to vote at least 42% of the Company's shares in favor of the Proposed Acquisition.

66.     Defendants agreed to these preclusive and coercive deal protection devices despite the fact that at least one competing bidder has shown serious interest in making a bid for the Company. With the deal protections devices in place, however, this bidder and all other competing bidders are

now precluded from making competing bids for the Company. Accordingly, without intervention of the Court, the Proposed Acquisition is a *fait accompli.*

67.    Under Delaware law, the Company's public shareholders deserve to receive the maximum value for their shares in the Proposed Acquisition. The consideration reflected in the Proposed Acquisition, however, falls short and does not adequately value the Company's substantial assets or the sizeable merger synergies that JDA stands to gain if the Proposed Acquisition is consummated. Moreover, shareholders are not being compensated for the value of i2's extensive NOL's and patent portfolio.

### SELF-DEALING

68.    Defendants and/or other Company insiders stand to obtain substantial personal benefits as a result of the Proposed Acquisition. For example, defendants stand to receive millions of dollars in change of control benefits if the Proposed Acquisition is consummated, as well as the potential extinguishment of the outstanding derivative suits that name them as defendants.

69.    Additionally, Amalgamated, which pushed for a sale of the Company, and Sidhu, stand to monetize their illiquid control-block holdings in the Company. For its part, Amalgamated was able to negotiate a preference for payment of its Series B Preferred Shares, which otherwise would have been subjected to conversion and treatment as i2 common stock.

70.    By reason of their positions with i2, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of i2, and especially the true value and expected increased future value of i2 and its assets, which they have not disclosed to the Company's public stockholders. Moreover, despite their duty to maximize shareholder value, the defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of the Company's public shareholders.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 32

71. The proposed sale is wrongful, unfair and harmful to the Company's public stockholders, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members. Specifically, defendants are attempting to deny plaintiff and the Class their shareholder rights via the sale of i2 on terms that do not adequately value the Company; and defendants have failed to disclose all material information concerning the true value of the Company. Accordingly, the Proposed Acquisition will only benefit defendants.

72. In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- withdraw their consent to the sale of i2 and allow the shares to trade freely – without impediments;

- act independently so that the interests of the Company's public stockholders will be protected;

- adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value and, to the extent such conflicts exist, ensure that all conflicts be resolved in the best interests of the Company's public stockholders;

- solicit competing bids to i2's offer to assure that the Company's shareholders are receiving the maximum value for their shares; and

- fully and fairly disclose all material information to shareholders regarding the Proposed Acquisition and the true value of the Company.

73. The Individual Defendants have also approved the Proposed Acquisition so that it transfers 100% of the Company's unique assets, revenues and profits to JDA, thus all of the Company's operations will now accrue to the benefit of JDA.

## DEFENDANTS FAILED TO MAXIMIZE SHAREHOLDER VALUE

74. As a result of defendants' conduct, the Company's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 33

entitled in a sale of their Company. In order to meet their fiduciary duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, not structure a preferential deal for themselves that will allow them to reap benefits from, among other things, their severance agreements and the immediate vesting of stock options.

75.     The consideration reflected in the Proposed Acquisition agreement does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors and officers of i2, at the time the Proposed Acquisition was announced because, among other things, it does not properly value the substantial synergies, NOL's and patent portfolio that JDA stands to acquire.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action on his own behalf and as a class action on behalf of all holders of i2 stock who are being and will be harmed by defendants' actions described herein (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

77.     This action is properly maintainable as a class action.

78.     The Class is so numerous that joinder of all members is impracticable. According to the Company's SEC filings, there were 21.4 million shares of i2 common stock outstanding as of April 28, 2008.

79.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia,* the following:

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 34

(a)    whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)    whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)    whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(d)    whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of i2;

(e)    whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(f)    whether the Individual Defendants have breached their fiduciary duties of candor to plaintiff and the other members of the Class in connection with the Proposed Acquisition by soliciting shareholder votes in favor of the Proposed Acquisition based upon inadequate disclosures;

(g)    whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(h)    whether defendants i2, Amalgamated and JDA aided and abetted the Individual Defendants' breaches of fiduciary duties; and

(i)    whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 35

80.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

81.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

82.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

83.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

84.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

85.     Plaintiff repeats and realleges each allegation set forth herein.

86.     The Individual Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of i2 and have acted to put their personal interests ahead of the interests of the Company's shareholders.

87.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from i2.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 36

88.     The Individual Defendants have violated their fiduciary duties by entering i2 into the Proposed Acquisition contract without regard to the effect of the proposed transaction on the Company's shareholders.

89.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of i2 because, among other reasons:

(a)     they failed to take steps to maximize the value of i2 to its public shareholders and they took steps to avoid competitive bidding, to cap the price of the Company's stock and to give the Individual Defendants an unfair advantage, by, among other things, failing to adequately solicit other potential acquirors or alternative transactions;

(b)     they failed to properly value i2 and its various assets and operations; and

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Acquisition.

90.     Because the Individual Defendants dominate and control the business and corporate affairs of i2, and are in possession of private corporate information concerning the Company's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of i2 which makes it inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

91.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

92.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Acquisition which will exclude the Class from its fair share of the Company's valuable assets and operations, and/or benefit defendants in the unfair manner complained of herein, all to the irreparable harm of the Class.

93.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

94.    As a result of the Individual Defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of the Company's assets and operations. Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and will not supply to the Company's minority stockholders sufficient information to enable them to cast informed votes regarding adoption of the Proposed Acquisition contract and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

95.    Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

### SECOND CAUSE OF ACTION

#### Claim for Aiding and Abetting Breaches of Fiduciary Duty
#### Against Defendants i2, Amalgamated and JDA

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 38

97.     Defendants i2, Amalgamated and JDA aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of i2, including plaintiff and the members of the Class.

98.     The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

99.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

100.    i2, Amalgamated and JDA colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

101.    Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring and decreeing that the Proposed Acquisition agreement was entered into in breach of the fiduciary duties of the Individual Defendants, that i2, Amalgamated and JDA aided and abetted the Individual Defendants' breaches of fiduciary duties, and that the Proposed Acquisition agreement and is therefore unlawful and unenforceable;

C.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 39

adopts and implements a procedure or process to obtain a merger agreement providing the highest possible value for shareholders;

D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of the Company's shareholders until the process for the sale or auction of the Company is completed and the best possible consideration is obtained for i2;

E.     Rescinding, to the extent already implemented, the Proposed Acquisition agreement or any of the terms thereof, including the onerous and preclusive deal protection devices;

F.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

DATED: August 12, 2008                    BARON & BUDD, P.C.

_____
BRUCE W. STECKLER
TEXAS STATE BAR NO. 00785039
KELLY N. REDDELL
TEXAS STATE BAR NO. 12618250

3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Telephone: 214/521-3605
214/520-1181 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ORIGINAL PETITION FOR BREACH OF FIDUCIARY DUTY – Page 40

none the

ORIGINAL

**United States District Court**
**Northern District of Texas**  3 - 0 8 CV 1 4 24 - G

**Supplemental Civil Cover Sheet For Cases Removed**
**From State Court**

RECEIVED

AUG 1 4 2008

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**This form must be attached to the Civil Cover Sheet at the time the case is filed in the U.S.**
**District Clerk's Office. Additional sheets may be used as necessary.**

1.  **State Court Information:**

    Please identify the court from which the case is being removed and specify the number assigned to the case in that court.

| <u>Court</u> | <u>Case Number</u> |
| --- | --- |
| G-134th Judicial District Court, Dallas County, Texas | 08-09245 |

2.  **Style of the Case:**

    Please include all Plaintiff(s), Defendant(s), Intervenor(s), Counterclaimant(s), Crossclaimant(s) and Third Party Claimant(s) still remaining in the case and indicate their party type. Also, please list the attorney(s) of record for each party named and include their bar number, firm name, correct mailing address, and phone number (including area code.)

| <u>Party and Party Type</u> | <u>Attorney(s)</u> |
| --- | --- |
| John D. Northsworthy, on behalf of himself and all others similarly situated | Bruce W. Steckler<br>Kelly N. Reddell<br>Baron & Budd PC<br>3102 Oak Lawn Ave, Ste 1100<br>Dallas Texas 75219<br>(214) 250-1181 |
| JDA Software, Inc. | Jennifer A. Lloyd<br>DLA Piper US LLP<br>1221 South Mopac Expressway<br>Austin, Texas 78746<br>(512) 457-7000 |
| I2 Technologies, Sanjiv Sidhu, Jackson L. Wilson, Jr., Richard L. Clemmer, J. Coley Clark, Stephen Bradley, Lloyd G. Waterhouse, Richard Hunter, David L. Pope, Michael Simmons, Amalgamated Gadget, LP | Unknown at this time |

3.    **Jury Demand:**

Was a Jury Demand made in State Court?        No

If "*Yes,*" by which party and on what date?

4.    **Answer:**

Was an Answer made in State Court?        No

If "*Yes,*" by which party and on what date?

5.    **Unserved Parties:**

The following parties have not been served at the time this case was removed:

| Party | Reason(s) for No Service |
|---|---|
| I2 Technologies, Sanjiv Sidhu, Jackson L. Wilson, Jr., Richard L. Clemmer, J. Coley Clark, Stephen Bradley, Lloyd G. Waterhouse, Richard Hunter, David L. Pope, Michael Simmons, Amalgamated Gadget, LP and JDA Software, Inc. | Unknown |

6.    **Nonsuited, Dismissed or Terminated Parties:**

Please indicate any changes from the style on the State Court papers and the reason for that change:

| Party | Reason |
|---|---|

NONE

7.    **Claims of the Parties:**

The filing party submits the following summary of the remaining claims of each party in this litigation:

| Party | Claim(s) |
|---|---|
| Plaintiff | Breach of Fiduciary Duty on behalf of shareholders, seeking to enjoin merger |

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFF**

John D. Northsworthy, on behalf of himself and all others similarly situated

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Unknown**
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANT**

i2 Technologies, Sanjiv Sidhu, Jackson L. Wilson, Jr., Richard L. Clemmer, J. Coley Clark, Stephen Bradley, Lloyd G. Waterhouse, Richard Hunter, David L. Pope, Michael Simmons, Amalgamated Gadget, LP and JDA Software, Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Unknown**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Bruce W. Steckler and Kelly N. Reddell
Baron & Budd PC
3102 Oak Lawn Ave, Ste 1100
Dallas Texas 75219
(214) 250-1161

ATTORNEYS (IF KNOWN)
Jennifer A. Lloyd (Attorney for JDA Software Group, Inc.)
DLA Piper US LLP
1221 South Mopac Expressway
Austin, Texas 78746
(512) 457-7000

## II. BASIS OF JURISDICTION (PLACE 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN 'X' IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med. Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395FF)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## V. ORIGIN (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC 1332 (diversity) and 1441.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND    ☐ YES   ☒ NO

## VIII. RELATED CASE(S) (See instructions): None
IF ANY

DATE
August 15, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

WEST\21493840.1